**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-2311**

---

THE CINCINNATI INSURANCE COMPANY; THE
CINCINNATI CASUALTY COMPANY; THE CINCINNATI
INDEMNITY COMPANY,

Plaintiffs - Appellees,

versus

DYNAMIC DEVELOPMENT GROUP, LLC,

Defendant - Appellant,

and

BRANCH BANKING & TRUST COMPANY OF SOUTH
CAROLINA; BETTY HARBIN LITTLE; WILLIAM MASSEY
& ASSOCIATES, a/k/a William Massey &
Associates, Incorporated; WILLIAM H. MASSEY;
LANNEAU WILLIAM LAMBERT, JR.,

Defendants.

---

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  James A. Beaty, Jr.,
District Judge.  (CA-00-280; CA-00-281; CA-00-282; CA-00-283)

---

Argued:  September 21, 2005        Decided:  November 17, 2005

---

Before LUTTIG, Circuit Judge, HAMILTON, Senior Circuit Judge, and
James C. DEVER, III, United States District Judge for the Eastern
District of North Carolina, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

**ARGUED:** Henry Pickett Wall, Sr., BRUNER, POWELL, ROBBINS, WALL & MULLINS, L.L.C., Columbia, South Carolina, for Appellant. Andrew Albert Vanore, III, BROWN, CRUMP, VANORE & TIERNEY, Raleigh, North Carolina, for Appellees. **ON BRIEF:** E. Wade Mullins, III, BRUNER, POWELL, ROBBINS, WALL & MULLINS, L.L.C., Columbia, South Carolina, for Appellant. Thomas E. Crafton, Gene F. Zipperle, Jr., ALBER CRAFTON, P.S.C., Louisville, Kentucky, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

The present litigation arose from a large-scale construction project in which performance and payment bonds and a dual obligee rider, issued in connection with the loan for the project, were allegedly fraudulently created. The appellant, Dynamic Development Group, LLC (DDG) seeks a new trial on the basis of alleged errors in the jury instructions and verdict form. We affirm.

## I.

A.    Factual Background.[1]

On September 10, 1990, the Cincinnati Insurance Company, the Cincinnati Casualty Company, and the Cincinnati Indemnity Company (collectively Cincinnati) entered into an agency agreement (the Agency Agreement) with Massey & Associates (the Massey Agency), an independent insurance agency, and its president, William H. Massey (Massey), wherein it was agreed that the Massey Agency and Massey would act as sales agents for Cincinnati. Some years later, on August 25, 1995, Massey was given a Letter of Authority for use with Power of Attorney from Cincinnati. This document, for the first time, conferred authority on Massey to execute surety bonds on behalf of Cincinnati. The Letter of Authority was sent to the

---

[1]Our statement of the facts is largely <u>verbatim</u> from the district court's published opinion in this case denying DDG's motion for a new trial. <u>The Cincinnati Ins. Co. v. Dynamic Dev. Group, LLC</u>, 336 F. Supp. 2d 552, 557-58 (M.D.N.C. Sept. 17, 2004).

Massey Agency along with a "bond kit" containing, among other things, an embossed Cincinnati seal, bond forms, Cincinnati wafer seals, and powers of attorney (POAs) naming Massey, and others in his agency, as Cincinnati attorneys-in-fact for the purpose of executing authorized Cincinnati surety bonds if the bonds fell within the 1.6 million dollar authority expressly set forth in the POAs. Massey and the authorized employees of the Massey Agency were not authorized to use the POAs for the purpose of executing Cincinnati contract bonds, including performance and payment bonds such as the ones at issue in this case, unless and until they received prior written approval from Cincinnati.

On October 4, 1996, Cincinnati terminated the Agency Agreement by letter and thereby revoked Massey and the Massey Agency's ability to execute any new bonds on behalf of Cincinnati. On October 7, 1996, Daniel McCurdy, Senior Vice President and Bond Manager for Cincinnati, wrote Massey directing him to destroy all Cincinnati POAs previously provided to him and the Massey Agency. Cincinnati also directed Massey to return all other materials used to execute bonds, including the Cincinnati bond forms, the embossed seal, and the wafer seals. Two days later, Massey, on behalf of the Massey Agency, signed a limited agency agreement (the Limited Agency Agreement) acknowledging that the Agency Agreement had been terminated as of October 4, 1996, and that the Massey Agency would act as a limited agent for Cincinnati only for the purpose of

servicing policies which were issued prior to the October 4, 1996 termination date.  During the time span relevant to this action, Cincinnati never informed the general public nor the North Carolina Department of Insurance of the termination of the Agency Agreement and the creation of the Limited Agency Agreement.

A few months later, on January 15, 1997, Cincinnati's Bond Department received a memorandum from Massey stating that he had destroyed all Cincinnati POAs in accordance with Daniel McCurdy's letter of October 7, 1996.  Nevertheless, sometime after the termination of the Agency Agreement, Cincinnati instructed a field representative to go to the Massey Agency to physically retrieve the "bond kit" supplies.  The field representative reported back to Cincinnati headquarters that he was reluctant to pick up the materials for fear of his personal safety given that Massey's wife kept a gun in her purse and harbored resentment against Cincinnati. Thus, there remained some concern at Cincinnati that Massey still had bond materials, but Cincinnati took no additional action to retrieve them.

In January 1999, DDG entered into a construction contract with Centech Building Corporation (Centech) in the amount of 2.6 million dollars for the construction of a Sleep Inn Motel at Interstate 77 and Highway 150 in Iredell County, North Carolina (the Sleep Inn Project).  DDG obtained its construction financing for the Sleep Inn Project through Branch Banking & Trust.

In the past, Centech had obtained most of its insurance and bond needs through the Massey Agency. During the duration of the business relationship between the Massey Agency and Centech, the Massey Agency had written performance and payment bonds through Travelers Insurance Company, Amwest Surety, and other commercial sureties, but never through Cincinnati. At the time of the Sleep Inn Project, Centech was having financial problems and, consequently, its primary surety at the time, Travelers Insurance Company, refused to bond Centech for the project. The Massey Agency was particularly motivated to provide the bonds that Centech needed for the Sleep Inn Project because Centech owed the Massey Agency 30,000 dollars in back premiums for such things as workers' compensation and general liability coverage. To prevent Centech from losing the Sleep Inn Project while the Massey Agency attempted to obtain legitimate bonds from Amwest Surety, Massey decided to manufacture through Cincinnati a fraudulent payment bond, a fraudulent labor and performance bond, and a fraudulent dual obligee rider to make it appear that Centech had met the requirements of the building contract with DDG. Each of these fake bonds listed DDG as obligee.

According to Massey, when he manufactured the fake bonds, he copied a previously executed Cincinnati performance bond and a previously executed labor and material payment bond. Massey modified the bond by whiting-out the blanks on the old bond, and

then inserting the necessary information on a photocopied form.  As for the dual obligee rider, Massey indicated that he did not have a standard dual-obligee-rider form because those forms had not been included in his original "bond kit" from Cincinnati; therefore, he used a Cincinnati indemnity-type performance bond provided to him, and manually typed "Dual Obligee Rider" at the top left of the bond form.  Massey's manufactured bonds lacked an original agent's signature, did not have the proper embossed seal or wafer seal, and did not have a power of attorney attached.

Not long after construction started on the Sleep Inn Project, Centech was unable to keep up with the project schedule.  Accordingly, subcontractors and vendors began requesting information regarding the bonds in order to file payment claims.  According to Cincinnati, only when it began to receive payment claims from some of these subcontractors and/or vendors did it begin to suspect something was amiss.  Cincinnati then searched its files but could not find any record of issuing bonds for the Sleep Inn Project or Centech.  Further investigation revealed that Massey had issued fraudulent Cincinnati bonds for approximately 9 million dollars, including the 2.6 million dollars worth issued in connection with the Sleep Inn Project.

B.  Relevant Procedural History.

On March 21, 2000, Cincinnati filed the present declaratory judgment action in the United States District Court, Middle

District of North Carolina, against DDG and others. Cincinnati based federal subject matter jurisdiction on diversity jurisdiction. 28 U.S.C. § 1332. In its action, Cincinnati sought a declaration that it had no liability to DDG on the fake bonds and that they were void ab initio. DDG asserted four counterclaims against Cincinnati: (1) violation of the North Carolina Unfair and Deceptive Trade Practices Act; (2) common law bad faith; (3) negligently misrepresenting that Massey and the Massey Agency possessed authority to issue the bonds at issue; and (4) enforcement of the performance bond.

The district court subsequently disposed of numerous claims and parties in the case, including granting summary judgment in favor of Cincinnati with respect to DDG's counterclaims against it for violation of the North Carolina Unfair and Deceptive Trade Practices Act and common law bad faith. Cincinnati Ins. Co. v. Centech Building Corp., 286 F. Supp. 2d 669 (M.D.N.C. Oct. 2, 2003). However, the district court denied summary judgment in favor of Cincinnati with respect to Cincinnati's claim that the bonds at issue be declared invalid. The district court reasoned that "there [were] genuine issues of material fact as to whether [Cincinnati] negligently enabled Massey, either by failing to adequately retrieve his indicia of authority and/or by failing to inform third parties that his agency status was limited, to act

- 8 -

with apparent authority when he issued the fraudulent bonds . . . ." <u>Cincinnati Ins. Co.</u>, 286 F. Supp. 2d at 693.

Cincinnati's claim of bond invalidity and DDG's counterclaims for negligent misrepresentation and enforcement of the performance bond proceeded to a jury trial on October 6, 2003. After DDG rested its proof, it moved to amend its third counterclaim to conform to the evidence. First, DDG's motion to amend sought to change the heading of the third counterclaim from "Negligent Misrepresentation" to "Negligence and Negligent Misrepresentation." Second, DDG's motion sought to add allegations that Cincinnati was negligent in allowing Massey to retain certain indicia of authority provided to him by Cincinnati, and/or in failing to notify the public and North Carolina's Department of Insurance that Massey was no longer an active and authorized agent of Cincinnati. During argument on its motion to amend before the district court, DDG explained:

> [W]e have made allegations of negligence. We have made allegations that put them on notice that that is what we are alleging, that is that they were obligated to exercise reasonable and ordinary care in terminating the agency relationship. That is our allegation. What we have said in our pleading is, that -- we have called that in our pleading negligent misrepresentation, but what the pleading really says and amounts to is, saying that they were negligent in the manner that they went about terminating this relationship.
>
> What this amendment does, as you'll see, is simply elaborates on that and states in essence, specifies the negligence in that [Cincinnati] left Mr. Massey in possession of the bond kit, bond forms, powers of attorney, other indicia of authority.

(J.A. 289).

Further clarifying its position, DDG stated:

I think that there are two interrelated issues here, and I think we can go to the jury on two alternate theories of recovery, one being a contractual basis of recovery, that is that they had apparent authority, Mr. Massey had apparent authority to bind Cincinnati Insurance Company to liability under the bond, that would be a contractual case of apparent authority.

    The other aspect of apparent authority would be a negligent aspect of apparent authority, that is, the principal is liable for the acts its agent committed within the scope of its apparent authority in tort, not saying that the bond is valid necessarily, but that they acted negligently . . . .

(J.A. at 295) (emphasis added).

When the district court asked DDG whether it was indicating that apparent authority is only part of the breach of contract notion, DDG's counsel responded as follows:

In essence, I think -- I think it's all tied together, Your Honor, and the cases -- certain aspects of the cases of apparent authority hone in on these negligence issues and certain of them hone in on these just issues of apparent authority.

I agree with Mr. Vanore [Counsel for Cincinnati] that the whole concept of negligence is tied in with apparent authority.

(J.A. at 296) (emphasis added).

The district court granted DDG's motion to amend and then immediately engaged Cincinnati and DDG in a discussion regarding what issues should go to the jury. DDG informed the district court:

- 10 -

I think, Your Honor, our view is, that it would be possible for the jury to conclude that we agree with Cincinnati that these bonds are no good, these are fraudulent bonds, we're not going to enforce the bonds, and they could agree on that in any number of ways and they could come to the conclusion that they were just a fraud, but they could also find that even if the bonds were no good, that nonetheless, Cincinnati's conduct in the termination of this agent was negligent in failing to do these things that we've pled.

(J.A. 298).

The district court immediately responded:

I don't disagree with that, and I almost question whether or not the issue on the bond validity question to the jury could be whether or not the bonds were issued fraudulently, and I think the jury, based upon the evidence, would have to answer that question yes, <u>but then you get to the negligence aspect of it second, there still could be liability based upon negligence as tied in with apparent authority.</u>

(J.A. 298) (emphasis added).

DDG responded:

<u>That's exactly where [we are], Your Honor. . . . That's the way we perceive the case.</u>

(J.A. at 298-99) (emphasis added).

Consistent with DDG's perception of the case as expressed during argument on its motion to amend and during the charging conference, the district court instructed the jury that Cincinnati had brought a claim against DDG alleging that the bonds at issue were fraudulent, while DDG counterclaimed that Cincinnati "was negligent in allowing William Massey, or his agency, to hold himself out as having apparent authority to issue the bonds involved in this case." (J.A. 356). The district court then

- 11 -

instructed the jury that its verdict would take the form of answers

to three questions:

> First, were the bonds fraudulently issued?  There is
> a space for you to answer yes or no, and I'll give you
> further instructions specifically on that question in a
> moment.

> Question number two:  Was William Massey authorized
> under the doctrine of apparent authority to issue the
> bonds for Cincinnati; with a place for you to answer yes
> or no.

> Question number three, what amount of damages, if
> any, is Defendant Dynamic Development Group entitled to
> recover from the Plaintiff Cincinnati?

(J.A. 357).

Of relevance to the issues on appeal, the district court next

instructed the jury that the relationship between Massey and

Cincinnati, based upon the evidence in the case, is referred to as

an agency relationship.  The district court then defined an agency

relationship as a relationship where one person, the agent, is

empowered to take action on behalf of another person, the

principal.  The district court also instructed the jury that "[t]he

authority to have an agent to act with respect to a particular

matter may either be actual or it may be apparent."  (J.A. 360).

The district court then defined the concept of actual authority for

the jury as follows:

> a situation where the principal has actually authorized
> the agent to act on the principal's behalf with respect
> to a particular matter.  Actual authority may be granted
> by the principal by word of mouth or by writing or it may
> be implied by conduct of the principal amounting to

consent or acquiescence or by the nature of the work that the principal has entrusted to the agent.

(J.A. 360). The district court then instructed the jury that no evidence had been presented in the case that Massey possessed actual authority to issue the bonds in connection with the Sleep Inn Project.

The district court next contrasted the concept of apparent authority:

> Apparent authority, on the other hand, is the authority in which the principal has held the agent out as possessing or which the principal has negligently permitted the agent to hold himself out as possessing. If a principal acts or conducts his business either intentional or through negligence or failed to disapprove of the agent's acts or course of actions so as to lead the public to believe the agent possesses the authority to act, then the principal will be bound by the agent's acts within the scope of this apparent authority.

(J.A. 361) (emphasis added).

The district court then went on to give the jury standard instructions explaining the concept of negligence. Notably, the district court also gave the jury what amounted to a contributory negligence instruction by instructing that the scope of an agent's apparent authority will be governed by what authority the third person, here DDG, in the exercise of reasonable business prudence was justified in believing that the principal conferred upon its agent.

In wrapping up the bulk of its instructions on negligence, the district court instructed the jury:

So I finally instruct you on this issue that if [DDG] has proven by the greater weight of the evidence that Cincinnati negligently performed or negligently permitted William Massey to hold himself out as possessing authority, which included the authority to issue the bonds in this case on behalf of Cincinnati, and if you find [DDG] has shown by the greater weight of the evidence that [DDG] reasonably relied upon this appearance of authority in accepting and relying on the bonds, then it would be your duty to answer [the second question] in favor of [DDG].

On the other hand, if [DDG] has failed to prove such apparent authority, or its reasonable reliance thereon or if after considering all of the evidence you are unable to say what the truth is, then it would be your duty to answer [the second question] no in favor of [Cincinnati].

(J.A. 364).

Consistent with the district court's instructions, the verdict sheet submitted to the jury asked the jury to answer the following three questions.

1. Were the bonds fraudulently issued? **YES    NO**

2. Was William Massey authorized under the doctrine of apparent authority to issue the bonds for Cincinnati? **YES  NO**

3. What amount of damages, if any, is defendant Dynamic Development Group entitled to recover from plaintiff Cincinnati? _____

(J.A. 408). Notably, DDG's only objection to this verdict form prior to it being submitted to the jury went to question 2. Instead of the just quoted version of question 2 actually submitted to the jury, DDG had proposed that question 2 read: "Was Cincinnati negligent in allowing Massey to hold himself out with the apparent authority to act for Cincinnati?" (J.A. 341).

Following its deliberations, the jury returned a verdict in favor of Cincinnati, finding that the bonds were fraudulently issued and that Massey did not have apparent authority to issue the bonds. On October 16, 2003, the district court entered judgment upon the jury's verdict.

On October 22, 2003, DDG filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59 or, in the alternative, for judgment as a matter of law. DDG based the new trial portion of its post-trial motion on the following three arguments: (1) the district court's jury instructions and verdict form failed to put a simple negligence claim before the jury separate and apart from its negligence claim intertwined with the doctrine of apparent authority; (2) the district court failed to instruct the jury that when one of two persons must suffer from the fraud of another, the party who first reposed a confidence, or by his negligent conduct made it possible for the loss to occur, must bear the loss; and (3) the district court failed to instruct the jury on the portions of the North Carolina insurance statutes requiring insurance companies to "report, investigate and control the activities of corrupt agents." (J.A. 415).

The district court denied DDG's post-trial motion in toto. Cincinnati Ins. Co., 336 F. Supp. 2d at 565. This timely appeal followed in which DDG repeats each of its three arguments in support of its motion for a new trial.

II.

DDG's overarching argument on appeal is that it deserves a new trial because the district court's jury instructions and verdict form failed to put a simple negligence claim before the jury separate and apart from its negligence claim intertwined with the doctrine of apparent authority. According to DDG, its simple negligence claim rests upon its theory that Cincinnati "negligently supervised or terminated its agent Massey." (DDG's Br. at 17). DDG goes on to assert that its motion to amend its third counterclaim served to clarify its intent to allege such a negligence claim separate and apart from a negligence claim based upon or intertwined with the doctrine of apparent authority. DDG also represents to us that it repeatedly asked the district court to submit a separate verdict question to the jury on whether or not Cincinnati had negligently supervised or terminated its agency relationship with Massey, but that the district court refused to do so.

Cincinnati's opposition on appeal mirrors the district court's reasoning below in rejecting this same argument made by DDG in support of its motion for a new trial. The record in this case is crystal clear that DDG's separate negligence theory, wholly unrelated to the doctrine of apparent authority, was created by DDG out of whole cloth after the jury rendered its verdict. Cincinnati Ins. Co., 336 F. Supp. 2d at 562-63. For example, in DDG's motion

- 16 -

to amend its third counterclaim to conform to the evidence, the restated allegations all referred to indicia of authority; an apparent authority concept. Further, in DDG's arguments before the district court regarding the jury instructions, DDG admitted that the issue of negligence as pled by it was intertwined with the doctrine of apparent authority. Finally, in the proposed verdict form that DDG submitted to the district court for consideration, DDG only requested a specific question on negligence in the context of the doctrine of apparent authority.

We wholeheartedly agree with Cincinnati that the district court correctly ruled that DDG is not entitled to a new trial in order to put a simple negligence claim before the jury separate and apart from the doctrine of apparent authority.

> It is settled in this jurisdiction that the formulation of issues and the form of interrogatories is committed to the sound discretion of the trial judge. In considering the adequacy of the verdict form, we consider several factors, including whether the interrogatories adequately presented the contested issues to the jury when read as a whole and in conjunction with the general charge, whether submission of the issues to the jury was fair, and whether the ultimate questions of fact were clearly submitted to the jury.

Klein v. Sears Roebuck & Co., 773 F.2d 1421, 1426 (4th Cir. 1985) (citations omitted).

The short of the long is that the record below in no manner supports DDG's assertion on appeal that it alleged and pursued a simple negligence claim separate and apart from its negligence claim based upon the doctrine of apparent authority. As the

district court correctly observed in its published opinion denying DDG's motion for a new trial, from the time of DDG's motion to amend its third counterclaim to conform to the evidence until the case went to the jury, DDG repeatedly and consistently took the position before the district court that its negligence claim was intertwined with the doctrine of apparent authority.  Cincinnati Ins. Co., 336 F. Supp. 2d at 562.  At no time did DDG ever inform the district court that it sought to pursue a theory of negligence separate and apart from the doctrine of apparent authority.

In conclusion, we hold, based upon the reasoning of the district court, id. at 561-63, that the jury instructions and verdict form in this case adequately presented all contested issues to the jury when read as a whole and in conjunction with the district court's jury instructions.[2]  Accordingly, we affirm.

AFFIRMED

---

[2]As previously noted, DDG also makes the same two remaining arguments pertaining to jury instructions that it made below in support of its motion for a new trial.  We reject such arguments on the reasoning of the district court as well.  Cincinnati Ins. Co., 336 F. Supp. 2d at 563-565.